D. B. HICKS *vs.* ROBERT CHADWELL & CHARLES W. WHITE.

April Term, 1873.

PRACTICE—PARTNERSHIP ACCOUNT.—Upon a reference to the master to take a general partnership account, each party should furnish the master with a statement of the account as he insists it should be, and, upon these statements, the master should ascertain the points of difference, and settle with the parties the items on which proof should be taken.

PARTNERSHIP ACCOUNT.—No partnership account can be properly taken without first ascertaining the profit or loss, and then finding out, by separate accounts between each of the partners and the firm, how this profit or loss is to be shared.

SAME—PARTNERSHIP BOOKS.—In taking such accounts, the partnership books must, if not successfully impeached by the pleadings and proof, be taken as *prima facie* correct; and, if lost or destroyed, the best evidence is proof of their contents.

THE CHANCELLOR :—In January, 1868, the complainant and W. S. Whitman formed a partnership in the ice business, the latter agreeing to furnish the ice house, and all money necessary to start the business, the expenses of car-

rying on the business when the season opened to be paid out of the receipts, "and profits and losses were to be equally divided." During January ice was gathered in the vicinity of Nashville, estimated by the complainant at 600 tons, the cost of which was $959. In February the complainant says that on this ice insurance was obtained for $2000. On the 8th of March, 1868, the complainant sold one-half of his interest in the business, that is one-fourth of the whole to A. C. White. On the 12th of the same month Whitman sold out his interest to C. W. White, agent, and on the same day articles of partnership were drawn and executed by the complainant and the Whites. "The stock of ice on hand at that time," the complainant says in his deposition, "was valued at $2000, and I, being one-fourth owner, and in order to make me an equal partner with the Whites, executed my note to A. C. White for $166.66 which made me a one-third partner."

The articles of partnership of the 12th of March, 1868, recite the foregoing facts, and that the new firm of D. B. Hicks & Co. is to assume "the expenses incurred in getting up said ice *which debt is first to be paid out of the sales of ice made;* and all subsequent debts incurred about the ice business, either for additional ice, store-houses, wagons, teams, etc., and labor necessary to carry on the same, in a word, expenses of whatever kind in this connection first to be paid before the division of any profits." The articles further provide that "all profits and losses are to be borne by the three partners equally;" in all contracts especially of any magnitude, all the partners are to be consulted;" Hicks is to give his special attention to the selling of ice, and Charles W. White is to be book-keeper and treasurer, "and to give any other assistance he may have time to do, either in collecting or paying out the debts of the concern, and he is to retain charge of it until the business of the firm is all settled up." The final clause is as follows: "It is further agreed that the name or credit of the firm is in no case to be used for our individual interest, and no private

debt to be paid out of the ice money ; but when all the liabilities of the firm are settled, at the end of any week or any particular day agreed upon, should there be any money on hand, there may be an equal distribution by the treasurer." This firm borrowed from A. C. White $1200, for which a note was executed in the firm name by complainant.

On the 7th of May, 1868, the Whites sold their entire interest to defendant Robert Chadwell. C. W. White states in his deposition that Chadwell paid for such interest $1333.33, at which rate the whole business would be valued at $2000, thus corresponding with the valuation of the complainant in March. The purchase by Chadwell gave him an interest of two-thirds, and in order to make him and the complainant equal partners, the latter, both in his deposition and bill, states that he agreed that, upon a final division of profits, Chadwell should have $350 more of these profits than complainant. The allegation of the bill in this regard is tacitly admitted by Chadwell in his answer, but in his deposition, whether by clerical error or lapse of memory, he is made to put the same at $250. No doubt $350 is the correct amount, for that amount makes the value of the one-half interest, upon the basis previously followed, about $1000. A written agreement seems to have been entered into by complainant and Chadwell, which was deposited with C. W. White, and afterwards, with all the partnership books and papers accidentally burned in July, 1869. The substance of the agreement appears to have been that the new partnership was to continue under the provisions of the articles of the 12th of March, 1868, except there were now only two, instead of three partners equally to share the profits and losses. C. W. White continued to be the book-keeper and treasurer, but at the expense of Chadwell. The complainant says in his deposition that White, as book-keeper and treasurer, "did all the writing for the firm, kept all accounts, and made out all bills, received all moneys by express, or post-office orders, and paid out all moneys of the business of the firm." The business was carried on by this last firm until about the close

of October or 1st of November, 1868. The original stock of ice gathered at Nashville at a cost of $959, was added to from time to time by purchases of Northern Lake ice and Louisville thin ice made under a contract with A. Jackson entered into by complainant on the 14th of March, 1868, by which the former ice was to be furnished at $15 a ton and the latter at $10, to be weighed and delivered at Nashville. The ice thus received consisted of 46 car loads, of which three were received in March, three in May, and the residue in June and July, the last receipt being on the 29th of July. The firm seems also to have bought some 93 tons of Northern Lake ice from J. P. Cromie at Nashville, about two tons early in the season, and the residue after they had ceased to receive ice from Louisville. The ice was bought at one cent per pound, and sold, the complainant says in his deposition, "at from $1.50 to $2 per hundred pounds," and the profit on it, if any, he concedes was small. It will be noticed that only thirty tons of ice were added to the stock of Tennessee ice in March, only a ton or two, if any, in April, and about thirty tons in May. It is very obvious from these figures that the stock of ice on hand at any one time after May must have been light, and that the business was carried on with ice purchased almost daily to meet the demands of customers.

After the close of the business, in November or December, 1868, the partners seem to have had a meeting, at the room of the book-keeper, White, with a view to a settlement, at which the books were examined, and the subject of profit or loss discussed. Chadwell and White say that it was agreed that there was a loss of the entire investment, and that complainant was indebted to Chadwell. The complainant, without expressly denying this result of the interview, says that he demanded a balancé sheet, not understanding book-keeping himself, and no such balance sheet was ever furnished. It is also proved by Chadwell and White, and conceded by Hicks, that the note of the latter for $166.66, given in March to make his interest in the business equal to a third with the Whites, was sold and assigned to Chadwell, and that it was presented

to complainant for payment by C. W. White for Chadwell. What took place at this interview is differently stated by White and complainant, but it is admitted that the note was not paid and that Chadwell sued complainant upon it and recovered judgment. The collection of this judgment was enjoined by the bill, which was filed on the 8th of September, 1870. The bill prayed for a general partnership account of the ice business of D. B. Hicks & Co. After the defendants had answered, an order was made, without a hearing of the cause, referring it to the master to take an account of the partnership business. Upon this reference a number of depositions has been taken, and the clerk and master has made a report, to which both parties have filed exceptions.

Upon an examination of this report, and the pleadings and evidence, I feel constrained to set it aside altogether. It contains a very loose and, to the clerk and master himself, unsatisfactory attempt to embrace the partnership transactions in a few general items. The proof shows beyond all question that both parties made collections of debts, and received moneys due the firm, which, however, seem to have been paid to the treasurer. A regular set of books were kept and by, from all that appears, a competent bookkeeper. Both partners seem also to have drawn out and used some of the partnership money. The proof shows, too, that Chadwell paid the original outlay of $959 to start the business, or that this sum, which was, according to the articles of partnership, "first to be paid out of the sales of ice to be made," was due him. The proof further shows that no bank account was kept after the season fairly opened, because the income was used as fast as received in buying stock and paying expenses. It further shows that it was necessary to borrow money on one if not more occasions, and that no day was fixed to divide profits under the articles of partnership, The clerk and master has taken no account whatever between the partners severally and the firm, but has assumed that the defendant Chadwell is indebted to the complainant for one-half of the supposed profits.

In making these remarks, I do not intend to throw the blame upon the clerk and master. He seems to have .done the best he could with the crude material tossed down before him, without any account made out and presented by the parties, and without any direction from the court.' Under the practice in England and in New York, as long as a separate chancery system was kept up in that state, upon a decretal order for a regular partnership account, it seems to have been the duty of each litigant to present to the clerk and master a statement of the account as he claimed it ought to be. With these statements before him, the clerk and master readily ascertained the points of difference, and settled with the parties the items upon which proof should be taken. Our practice, if practice it can be called, is to haul in a load of partnership books, take a few general depositions, file, perhaps, a memorandum of suggestions, and leave the rest to the bewildered functionary, and the doctrine of chances.

No partnership account can be properly taken without first ascertaining whether there has been any profit or loss in the business, and then finding out, by separate accounts of each of the partners with the firm, how this profit or loss, as the case may be, should be divided between them.

In all partnership accounts, moreover, the partnership books which have been kept either by the partners or by a book-keeper selected by them, must be taken as *prima facie* correct. *Heartt* v. *Corning*, 3 Paige, 566 ; *Stoughton* v. *Lynch*, 2 Johns. Ch. 218 ; *Smith* v. *Chandos*, 2 Atk. 158. They cannot be departed from except upon such evidence as will entitle a partner to surcharge or falsify particular items. If the books are not impeached in the pleadings, the evidence required to vary the accounts as shown by them should be very strong indeed to justify the departure. 2 Hen. & M. 549 ; 4 Id. 368.

If, as in this case, the books have been accidentally destroyed or lost, the next best evidence is proof of their contents. The parties cannot be permitted to throw the books

entirely aside, and resort to other testimony to establish the accounts, until it is shown by the evidence of the book-keeper, and of such other persons as may have seen and examined the books, that the contents, or their substance cannot be supplied. The bill in this case does not impeach the partnership accounts as kept in the partnership books by the partnership book-keeper. The clerk and master in executing the reference must, therefore, be guided in the first instance by the contents of these books as far as they can be established by witnesses who had the opportunity of examining them, and who are able to state them. Evidence may be taken to fill up *lacunæ*, but not to contradict the contents of the books as far as they can be established, except upon the principles of surcharging and falsifying.

Two points have been dwelt upon in the argument before me ; one made by the defendants' counsel, that there was a stated acccount between the parties in December, 1868, at the interview at White's room, which is conclusive upon the complainant ; the other by the plaintiff's counsel in relation to the price of the Tennessee ice.

The decretal order heretofore made in this cause is conclusive upon the first point. That is an order for a general partnership account, which could only be made upon the supposition that there never had been a stated account binding upon the parties. And, if the point had not been thus settled, the evidence fails to make out a case for the application of the principle contended for. If the books cannot be supplied so as to show the results of the business as appeared from them, and the parties are compelled to guess at results, then the evidence relied on to establish a stated account may well be looked to by the clerk and master and the court to determine whether it is worth while to go into the accounts in order to show profits. The decree will leave this question open for further consideration if it becomes necessary.

Upon the second point, the amendment in the complainant's pleading opens the question of the price at which the Tennessee ice was sold. There is no proof of the quantity

17

of this ice except the complainant's own estimate, and it is given both in his bill and deposition only as an estimate. But the original bill, which is sworn to and is in this respect not corrected by the amendment, says, that this ice was valued at $3000 when the partnership with the Whites was formed, thus making each partner's share $1000. But this statement is in conflict with the fact mentioned in connection with it that complainant gave his note for $166.66 to one of the Whites in order to make him an equal partner. If you value the stock at $3000, complainant's share, which was one-fourth, previous to the execution of his note, would have been $750, and it would have taken a note for $250 to make him an equal partner. But if the stock is valued at $2000, then complainant's one-fourth was $500, and his note for $166.66 would equalize him. The statement in the bill is clearly an error of the draftsman upon its face. And when you turn to the complainant's deposition, you find that he states the valuation of the stock correctly at $2000. It is clear, therefore, that the clerk and master, upon taking the partnership account, cannot estimate the Tennessee ice, no matter what may have been its quantity, at more than this agreed valuation, unless the books of the partnership show, or are proved to have shown, that such ice did actually realize more. And, on the other hand, the clerk and master is not bound to adopt the valuation if the proof establishes that the ice did not sell for so much.

In executing the reference, if it becomes necessary to resort to the opinions of witnesses and deductions from general data, the clerk and master should also bear in mind that abstract estimates of that kind are very misleading. It is precisely such delusive figuring in advance, without making proper allowance for contingencies, that leads to so many disastrous failures. In such case, he will always take the lowest reliable estimates of sales or profits, and the highest estimates of prices paid and expenses. This is, of course, upon the supposition that all parties are equally honest. If there has been any wilful destruction or suppression of papers, or with-

holding of evidence, a different rule would govern. And the direction is not intended as a general rule for all cases, but only, under the circumstances, for this particular case.